[Docket Nos. 185, 206, 207, 237, 272, 283, 284, 299, 343, 344, 346]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| DOMINIC FAIELLA,<br><br>   Plaintiff,<br><br>   v.<br><br> SUNBELT RENTALS, INC., and<br> LIVE NATION WORLDWIDE, INC.<br><br>   Defendants. | No. 18-11383 (RMB/AMD)<br><br> **OPINION** |

**APPEARANCES**
Anthony John Leonard
Law Offices of Anthony J. Leonard, LLC
1920 Chapel Avenue West, Suite 195
Cherry Hill, New Jersey 08002

    *On behalf of Plaintiff*

Benjamin Edward Smith
Law Offices of Anthony J. Leonard, LLC
11 Garden Street, Suite 208
Mount Holly, New Jersey 08060

    *On behalf of Plaintiff*

Thomas J. Wagner
Amy Lynn Wynkoop
Law Offices of Thomas J. Wagner
8 Penn Center, 6th Floor
1628 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103

    *On behalf of Defendant Sunbelt Rentals, Inc.*

Derrick G. Timms
Drew J. Parker
Parker Young & Antinoff, LLC
Executive Court
2 Eves Drive, Suite 200
Marlton, New Jersey 08053

    *On behalf of Defendant Live Nation Worldwide, Inc.*

**RENÉE MARIE BUMB, United States District Judge**

This matter comes before the Court on several motions brought by Plaintiff

Dominic Faiella ("Plaintiff"), Defendant Live Nation Worldwide, Inc. ("Live

Nation"), and Defendant Sunbelt Rentals, Inc. ("Sunbelt"), [Docket Nos. 185, 206,

207, 237, 272, 283, 284, 343, 344, 346], as well as the Court's *sua sponte*

reconsideration of its July 29, 2021 Order [Docket No. 299]. On November 19 and

December 14, 2021, the Court held hearings on these motions. For the reasons set

forth herein, the Court will vacate its prior Order [Docket No. 299], and grant, in

part, and deny, in part, the motions.[1]

## I.  FACTUAL BACKGROUND

Because this Opinion is written primarily for the parties' benefit, the Court's

recitation of the facts will be brief. On June 10, 2017, Plaintiff was employed as a

parking manager by Live Nation and working at a concert at BB&T Pavilion in

---

[1] To the extent the Court has made earlier statements that the parties assert
contradicts with this Opinion, this Opinion controls. Additionally, given that the
Court will vacate its prior Order, Plaintiff's Motions for Reconsideration [Docket
Nos. 343, 344] will be dismissed as moot. The Court also addressed the parties'
concerns and laid out its plan for bifurcating the trial at the December 14, 2021
hearing. Therefore, Plaintiff's Motion to Bifurcate [Docket No. 346] will also be
dismissed as moot.

Camden, New Jersey. He was using a utility terrain vehicle ("UTV") called the Polaris Ranger (the "Ranger") as part of his employment. Live Nation had rented the Ranger from Sunbelt. That day, Plaintiff got into a confrontation with two of his coworkers. At the end of the confrontation, Plaintiff caused the Ranger to rapidly accelerate while making a sharp right turn. The Ranger then rolled over onto its driver's side. Plaintiff suffered injuries to his right leg as a result of the accident. Plaintiff was not wearing a seat belt and, in fact, had defeated a safety mechanism by buckling the seat belt without actually wearing it over his body.

One crucial disputed fact in this case revolves around the absence of cab nets on the Ranger. It is undisputed that the cab nets were not on the Ranger at the time of the accident. However, the parties dispute who removed the cab nets and when. This factual question is central to many of the remaining claims in this suit. The parties also dispute whether Sunbelt advertised the Ranger as suitable for use on "any type of terrain," despite the manufacturer's warning that it should not be driven on paved surfaces. There are also genuine disputes between Live Nation and Sunbelt that can be summarized as whether each party satisfied their obligations under the relevant rental agreement.[2]

## II.   PROCEDURAL BACKGROUND

This matter was removed to this Court by Sunbelt on July 5, 2018. [Docket No. 1.] The parties engaged in discovery, motions practice, and arbitration for two

---

[2] The Court notes that this is not an exhaustive list of the genuine issues of material fact.

years before going to arbitration in July 2020. [*See* Docket.] The arbitration award was received and filed under seal by the Court on July 20, 2020, and Sunbelt filed a Request for Trial *de novo* on August 18, 2020. [Docket No. 181.]

Prior to arbitration, Plaintiff filed a Fourth Amended Complaint, which is the operative Complaint in this matter. [Docket No. 97.] It alleges six Counts: Violation of the New Jersey Products Liability Act, as against Sunbelt, for Manufacturing Defect (Count I), Design Defect (Count II), Failure to Warn (Count III), and Breach of Implied Warranty (Count IV); Negligence, as against Sunbelt (Count V); and Intentional Tort, as against Live Nation (Count VI). [*Id.*]

Sunbelt filed an Answer and Cross-Complaint, which alleges five crossclaims against Live Nation: Contribution and Contractual Indemnity (Count I); Declaratory Judgment (Count II); Breach of Contract (Count III); Negligence (in the alternative) (Count IV); and Contribution and Common Law Indemnity (Count V). [Docket No. 104.]

Finally, Live Nation also filed an Answer and Cross-Complaint, which alleges three crossclaims against Sunbelt: Indemnification (Count I); Contribution (Count II); and Contractual Indemnity and Assumption of Defense (Count III). [Docket No. 108.]

There are several pending motions in this matter, which the Court previously summarized as follows:

> First, Live Nation filed a Motion for Summary Judgment [Docket No. 185] on August 27, 2020. Broadly, this Motion argues that Plaintiff's claims and Sunbelt's crossclaims are barred by the Worker's

Compensation Bar. [*See id.*] Plaintiff filed his Response in Opposition [Docket No. 195] on September 21, 2020. Sunbelt filed its Response in Opposition [Docket No. 196] on September 21, 2020. Live Nation filed its Reply [Docket No. 198] on September 28, 2020. This Motion has been administratively terminated since January 8, 2021. [*See* Docket Nos. 235, 271.]

Second, Plaintiff filed a Motion for Summary Judgment [Docket No. 206] on November 13, 2020. Broadly, this Motion argues that Plaintiff cannot be found to have been contributorily negligent. [*See id.*] Sunbelt filed its Response in Opposition [Docket No. 225] on December 7, 2020. Plaintiff filed his Reply [Docket No. 228] on December 14, 2020. This Motion has been administratively terminated since January 8, 2021. [*See* Docket Nos. 235, 271.]

Third, Sunbelt filed a Motion for Summary Judgment [Docket No. 207] on November 13, 2020. Broadly, this Motion argues that Sunbelt is entitled to summary judgment on all counts alleged by Plaintiff. [*See id.*] Plaintiff filed his Response in Opposition [Docket No. 224] on December 7, 2020. Sunbelt filed its Reply [Docket No. 227] on December 14, 2020. Sunbelt also filed a Supplemental Motion [Docket No. 284] on May 21, 2021. This Motion has been administratively terminated since January 8, 2021. [*See* Docket Nos. 235, 271.]

Fourth, Sunbelt filed a Motion to Redact and Seal [Docket No. 237] on January 20, 2021. Broadly, this Motion argues that any reference to the Arbitration Award and Findings—namely a specific piece of testimony from the parties' Arbitration—be stricken from the record. [*See id.*] Live Nation filed its Response in Opposition [Docket No. 240] on February 2, 2021. Plaintiff filed his Response in Opposition [Docket No. 241] on February 2, 2021. Sunbelt filed its Reply [Docket No. 242] on February 9, 2021.

Fifth, Sunbelt filed a Motion for Summary Judgment [Docket No. 272] on May 5, 2021. Broadly, this Motion argues that Sunbelt is entitled to summary judgment in its favor on its crossclaims against Live Nation and on Live Nation's crossclaims against it. [*See id.*] Live Nation [filed its Response in Opposition [Docket No. 286] on June 7, 2021]. . . . Sunbelt filed its Reply [Docket No. 287] on June 14, 2021.

Sixth, Live Nation subsequently filed its own Motion for Summary Judgment [Docket No. 283] on May 19, 2021. Broadly, this Motion argues that Live Nation is entitled to summary judgment on

Sunbelt's crossclaims. [*See id.*] Sunbelt filed its Response in Opposition [Docket No. 285] on May 26, 2021. Live Nation did not file a Reply.

[Docket No. 299, at 2–3.][3]

On July 29, 2021, the Court issued an Order resolving the above motions.

[Docket No. 299.] However, on November 19 and December 14, 2021, the Court

held hearings about the motions. In light of those hearings, the Court determined

that the best course of action would be to vacate its July 29, 2021 Order and issue a

written Opinion and Order. The Court now takes the opportunity to do that.

---

[3] The Court also noted:

> Additionally, there are two Motions not included among those listed here. [Docket Nos. 203, 205.] The Court struck Live Nation's Motion for Summary Judgment [Docket No. 203] on May 11, 2021. [Docket No. 278.] Plaintiff's Motion in Limine [Docket No. 205] is and will remain administratively terminated until after the filing of the Final Pretrial Order. [See Docket Nos. 223, 271.]

[Docket No. 299, at 3 n.1.]

Plaintiff also filed three motions between the November 19 and December 14, 2021 hearings. The first was a Motion for Reconsideration of the Court's grant of summary judgment in Sunbelt's favor on Plaintiff's design defect claim. [Docket No. 343.] The Second was a Motion for Reconsideration of the Court's rejection of Plaintiff's *Suter* and *Waterson* arguments, discussed below. [*See* Docket No. 344.] Finally, Plaintiff filed a Motion to Bifurcate. [Docket No. 346.] As noted above, the Court will dismiss each of these motions as moot.

## III.    JURISDICTION

The Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are diverse[4] and the amount in controversy exceeds $75,000. [*See* Docket No. 97.]

## IV.    LEGAL STANDARD

### A.    Motion for Summary Judgment

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Id.*

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." *Id.*

---

[4] To wit, Plaintiff is a citizen of New Jersey, Sunbelt is a citizen of North Carolina and South Carolina, and Live Nation is a citizen of Delaware and California. [*See* Docket No. 97, ¶¶ 2–4.]

7

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous. They "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and conjecture may not defeat summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

## V.    ANALYSIS

### A.    Live Nation's First Motion for Summary Judgment [Docket No. 185]

Live Nation's first Motion for Summary Judgment seeks the dismissal of (1) Plaintiff's claims against Live Nation pursuant to the Worker's Compensation Bar and (2) Sunbelt's crossclaim for contribution and common law indemnity. [*See* Docket No. 185-3.] The Court will address each argument.

#### 1.    Plaintiff's Intentional Wrong Claim

The New Jersey Workers' Compensation Act (the "Act") represents an implicit *quid pro quo* agreement between employers and employees. *See* N.J. STAT. ANN. § 34:15-1 *et seq.*; *Millison v. E.I. Du Pont de Nemours & Co.*, 101 N.J. 161, 173–74 (1985). The Act constitutes a "trade-off whereby employees relinquish[] their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffer[] injuries by accident arising out of and in the course of employment." *Millison*, 101 N.J. at 174; *see* N.J. STAT. ANN. § 34:15-8.

However, the relinquishment of the right to sue is not absolute:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, **except for intentional wrong**.

N.J. STAT. ANN. § 34:15-8 (emphasis added). The New Jersey Supreme Court has created a two-prong test to determine whether or not an employer's conduct constitutes an "intentional wrong." *See Laidlow v. Hariton Machinery Co., Inc.*, 170 N.J. 602, 617 (2002) (*citing Millson*, 101 N.J. 161). Namely,

> (1) the employer must know that [its] actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

*Id.*

In deciding a summary judgment motion on the issue of the intentional wrong exception to the Act, "the trial court must make two separate inquiries." *Id.* at 623. First, it must ask whether a jury, when viewing the evidence in the light most favorable to the employee, could conclude that the first prong, known as the "conduct prong," has been satisfied. *Id.* If the court answers that question affirmatively, then it must determine whether the second prong, known as the "context prong," has been satisfied. *Id.* "Resolving whether the context prong . . . is met is solely a judicial function." *Id.* In other words, "if the substantial certainty standard presents a jury question and if the court concludes that the employee's

9

allegations, if proved, would meet the context prong, the employer's motion for summary judgment should be denied; if not, it should be granted." *Id.*

In *Laidlow*, the New Jersey Supreme Court found that the plaintiff had satisfied the conduct prong in a case in which the employer removed a safety device, "prior close-calls" had occurred, the potential injury that could occur as a result of the removal of the safety device was "serious[]," the employee had previously "complain[ed] about the absent [safety device]," and the employer had "deliberate[ly] and systematic[ally] dece[ived] . . . OSHA," which indicated the employer's "guilty knowledge." *Id.* at 622. "However, [the Court] declined to issue a *per se* rule that removal of safety devices or OSHA violations equate to intentional wrongs." *Van Dunk v. Reckson Associates Realty Corp.*, 210 N.J. 449, 463 (2012) (citing *Laidlow*, 170 N.J. at 622–23).

The *Laidlow* Court also held that the context prong was satisfied. *Laidlow*, 170 N.J. at 622. It wrote:

> [I]f an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life.

*Id.*

Similarly, in *Mull v. Zeta Consumer Products*, 176 N.J. 385 (2003), the New Jersey Supreme Court ruled in an employee's favor given the following facts: The plaintiff, who worked in a plastic-bag manufacturing facility, was working on a

10

machine called a "winder," which "turned the bags on spools to prepare them for

packaging and delivery." *Van Dunk*, 210 N.J. at 464 (citing *Mull*, 176 N.J. at

387–88).

> The plaintiff was injured one day when she pressed a stop button on the machine to repair a jam on the winder and, as she was fixing the machine, it suddenly turned on, pulling her hand into it and causing injury. . . . [P]rior to the plaintiff's injury, OSHA had cited the defendant for safety violations, the defendant nevertheless had removed safety devices from the winder, another employee had sustained a hand injury while working with the winder, and the employer was aware that employees repeatedly had complained about safety concerns.

*Id.* at 464–65 (citing *Mull*, 176 N.J. at 387–88, 392).

Another case in which the New Jersey Supreme Court ruled in the employee's

favor is *Crippen v. Central Jersey Concrete Pipe Co.*, 176 N.J. 397, 399 (2003). In that

case, the employee

> worked as a 'material man' and was expected to load sand and gravel into hoppers. To do so, he had to walk on a narrow plank and stand on an unsecured, six-foot tall ladder. While performing that job responsibility, [he] fell into the hopper and suffocated.
>
>    Eighteen months prior to [his] death, OSHA had cited the defendant for multiple violations, which had not yet been remedied at the time of [the] accident. The defendant's Environmental Health and Safety Manager also admitted, during discovery, that some of the hazardous conditions that had existed at the plant could cause an employee's death.

*Van Dunk*, 210 N.J. at 465 (citing *Crippen*, 176 N.J. at 399–403, 410). In that case,

"the deceptive nature of the employer's actions was essential to the . . . Court's

determination" that the context prong was satisfied. *Id.* at 466 (citing *Crippen*, 176

N.J. at 412–13 (Verniero, J., concurring)).

11

Conversely, in *Tomeo v. Thomas Whitesall Construction Co.*, 176 N.J. 366 (2003), the New Jersey Supreme Court ruled that an employer had not committed an intentional wrong despite the employer's deliberate bypassing of a safety mechanism. In that case, the employer had allegedly taped a safety lever on a snowblower so that the machine would "constantly be in the operational position." *Van Dunk*, 210 N.J. at 463 (citing *Tomeo*, 176 N.J. at 368). While using the snowblower, the employee "repeatedly used his hands to push snow through the chute when it became clogged and, eventually, while doing so, his hand became caught in the propellers and was injured." *Id.* (citing *Tomeo*, 176 N.J. at 368).

Nevertheless, the Supreme Court ruled that the employee had failed to satisfy both the conduct and the context prongs. *Tomeo*, 176 N.J. at 374–75. "The plaintiff was using a consumer product containing various warning labels about the type of injury he sustained, not an industrial piece of equipment" like the one in *Laidlow*. *Van Dunk*, 210 N.J. at 463–64 (citing *Tomeo*, 176 N.J. at 375–76). This was insufficient to show "that the employer was aware of a substantial certainty of an injury." *Id.* at 464 (citing *Tomeo*, 176 N.J. at 376). With respect to the context prong, the Court deemed that it could not

> be satisfied because plaintiff knew or should have known that the propellers were operating when he inserted his hand into the chute; the labels on the machine clearly warned him of the dangers in this consumer product; and the danger inherent in the snow blower was obvious. Those facts coupled with the presumption that a proper warning of danger will be heeded are dispositive on the context prong.

*Tomeo*, 176 N.J. at 377 (citation omitted).

12

With "the totality of the circumstances" analyses illustrated by the above cases serving as helpful guides, *see Van Dunk*, 210 N.J. at 469, it is clear that neither the conduct nor the context prongs are satisfied here. Even assuming that Live Nation removed the cab nets and failed to properly train its employees as Plaintiff alleges, [*see* Docket No. 195, at 14–15], Live Nation did not commit an intentional wrong as a matter of law. Like in *Tomeo*, Plaintiff was operating a consumer product with multiple warnings about the dangers of misusing the product. Like in *Tomeo*, Plaintiff knew or should have known that operating the Ranger in the way that he did could cause serious injury. Moreover, Plaintiff offers no evidence of any OSHA violations, any prior "close calls" or injuries resulting from the use of the Ranger, or of any complaints made to Live Nation about the missing cab nets or the failure to properly train employees on how to use the Ranger.

Put plainly, the facts here are insufficient to show that Live Nation "was aware of a substantial certainty of an injury." *See Van Dunk*, 210 N.J. at 464. This case is far more analogous to *Tomeo*, in which the Court ruled that no intentional wrong had occurred, than it is to *Laidlow*, *Mull*, or *Crippen*, in which the Court ruled for the employees. Therefore, the Court will grant Live Nation's Motion for Summary Judgment with respect to the intentional wrong argument. [Docket No. 299.]

### 2.    Sunbelt's Contribution and Indemnification Claims

The second argument in Live Nation's first Motion for Summary Judgment is that Sunbelt's claims for contribution and common law indemnity must be dismissed

as a result of Live Nation having not committed an intentional wrong. [*See* Docket No. 185-3, at 11–12.] Sunbelt concedes that "[t]he case law is clear that contribution under the Joint Tortfeasor's Contribution Act is not available against an employer tortfeasor unless it is determined that the employer is liable in tort." [Docket No. 196, at 13 (first citing *Ruvolo v. United States Steel Corp.*, 139 N.J. Super. 578, 583 (1976); and then citing *Arcell v. Ashland Chemical Co.*, 152 N.J. Super 471, 483–88 (1977)). Here, given the Workers' Compensation Bar, Live Nation is not liable in tort. Therefore, Sunbelt's claim for contribution fails.

However, implied indemnity is available as a remedy "when a special relationship exists between the employer and [a] third party, and the liability of the third party is vicarious." *Stephenson v. R.A. Jones & Co.*, 103 N.J. 194, 200 (1986) (quoting *Ramos v. Browning Ferris Indus., Inc.*, 103 N.J. 177, 189 (1986)). The lessor-lessee relationship is typically considered a special relationship. *See, e.g.*, *Ruvolo*, 139 N.J. Super at 584. Moreover, a reasonable jury in this case could find that Sunbelt is vicariously liable for Plaintiff's injuries. As such, it is possible that implied indemnity could apply in this case. Therefore, Sunbelt's claim for indemnity will survive.

In sum, the Court will grant, in part, and deny, in part, Live Nation's first Motion for Summary Judgment [Docket No. 185].

### B.    Plaintiff's Motion for Summary Judgment [Docket No. 206]

Next, the Court turns to Plaintiff's Motion for Summary Judgment, which argues that (1) "contributory negligence is not available as a defense and comparative negligence does not come into play because Plaintiff had no meaningful choice in the

operation of the Ranger" and (2) Plaintiff's non-use of a seat belt may not be considered. [*See* Docket No. 206-1, at 8–20 (cleaned up).]

### 1.   Applicability of *Suter* to Plaintiff's Strict Liability Claims

Plaintiff's first argument is that contributory negligence is not a viable defense here per *Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150 (1979). [Docket No. 206, at 8–10.] Under *Suter*, "the Comparative Negligence Act is applicable to strict liability actions," such as this one, "in those circumscribed areas in which plaintiff's conduct may be found to constitute contributory negligence." *Id.* at 164. A "plaintiff's negligence is unavailable as a defense when it consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence." *Id.* at 158. Conversely, "generally where a plaintiff with actual knowledge of the danger presented by the defective product knowingly and voluntarily encounters that risk, a trial court should submit the defense of contributory negligence to the jury." *Id.* In the employment context, however, "[t]he test of *Suter* is not simply whether plaintiff was injured while performing a task in the course of his employment." *Crumb v. Black & Decker*, 204 N.J. Super. 521, 527 (App. Div. 1985). Rather, "[t]he essence of the *Suter* rule is that the employee had no meaningful choice" in performing whatever task that resulted in his injury. *Id.*; *see also Suter*, 81 N.J. at 167, n.5 ("We are not herein passing upon other situations wherein an employee may similarly be held to have had no meaningful choice."); *Tirrell v. Navistar Int'l*, 248 N.J. Super. 390, 401 (App. Div. 1991) (holding that a decedent

"had no meaningful choice" but to be where he had been assigned by his employer). The *Suter* Court held "as a matter of policy" that an employee who is "engaged at his assigned task on a plant machine" definitionally "has no meaningful choice" and therefore cannot be "guilty of contributory negligence," "[i]rrespective of [whether] the employee may have unreasonably and voluntarily encountered a known risk." *Suter*, 81 N.J. at 167. Since *Suter*, New Jersey courts "ha[ve] expressly recognized that *Suter . . .* should not be limited to plaintiffs who were working (1) in a factory (2) at an assigned task (3) on a plant machine." *Cavanaugh v. Skil Corp.*, 331 N.J. Super. 134, 184 (App. Div. 1999) (citing numerous cases), *aff'd*, 164 N.J. 1 (2000).

The result of the *Suter* doctrine is that "[t]here is no question that the comparative negligence of a plaintiff is generally disregarded in a workplace setting." *See Congiusti v. Ingersoll-Rand Co., Inc.*, 306 N.J. Super. 126, 134 (App. Div. 1997) (first citing *Suter*, 81 N.J. at 167–68; and then citing *Ramos v. Silent Hoist & Crane Co.*, 256 N.J. Super. 467, 478 (App. Div. 1992)). An employee-plaintiff's "conduct" or "misuse"—clearly at issue here—"goes to the issue of" and should "be considered only on the issue of" "proximate cause." *Cavanaugh*, 331 N.J. Super. at 188, 190 (quoting *Grier v. Cochran Western Corp.*, 308 N.J. Super. 308, 325 (App. Div. 1998)), *aff'd*, 164 N.J. 1 (2000).

Here, Sunbelt offers four general arguments as to why *Suter* should not apply. The first is that Plaintiff was not engaged in an "assigned task" when the accident occurred. [*See* Docket No. 225, at 8.] Sunbelt contends that Plaintiff "did not operate

16

the Ranger . . . to get from one place to the other," but rather "[h]e drove it as a tantrum to express his annoyance and frustration with" his coworker. [*Id.*] This, "Sunbelt submits[,] . . . [is] outside the scope of employment." [*Id.*] Sunbelt reiterated this argument at the December 14, 2021 hearing, but has cited no authority to support the assertion. The Court is unconvinced by Sunbelt's argument, supported by no caselaw or other authority, that Plaintiff was not performing an assigned task. It will not rule that *Suter* is inapplicable on that basis.

Second, Sunbelt argues that Plaintiff in fact had a meaningful choice insofar as he could have utilized a different Ranger, driven a truck, or simply walked instead of utilizing the specific Ranger in question. [Docket No. 225, at 16.] The Court is not convinced by this argument, either. A similar argument was rejected in *McGee v. Stihl Inc.*, wherein the Court did not consider the defendants' argument that the plaintiff had a "meaningful choice" because he could have used "a different tool," as such an argument "tend[ed] to go to the very comparative negligence of [the plaintiff] that the *Suter* rule prohibits from consideration as a matter of public policy." Civil No. 08-520 (MLC), 2011 U.S. Dist. LEXIS 140595, at *11 (D.N.J. Dec. 7, 2011). Sunbelt also reiterated this argument—admitting that it dovetails somewhat with the assigned task argument—at the December 14 hearing. This Court has not been presented with any argument as to why it should not follow the logic in *McGee*, and it chooses not to do so. Therefore, the Court will not deem *Suter* inapplicable for that reason.

Third, Sunbelt makes a passing reference to a footnote in *Suter* that states that the doctrine does not protect "an employee who deliberately injures himself." [*See*

17

Docket No. 225, at 3.] *See also Suter*, 81 N.J. at 168 n.6. There is no real argument here that Plaintiff **deliberately** injured himself. No evidence suggests that Plaintiff planned for this accident to occur or that he intentionally and specifically tried to hurt himself by driving the Ranger in an allegedly negligent manner. This Court understands the *Suter*'s "deliberate injury" carve-out to be reserved for such situations in which it was the employee's goal to injure himself. There is no evidence to argue that such a standard was met here, which Sunbelt conceded at Oral Argument, so the Court will not rule that *Suter* does not apply on that basis.[5]

Finally, Sunbelt generally argues that "the accident would not have happened" if Plaintiff had not committed the actions or omissions that Sunbelt alleges he committed. [*See* Docket No. 225, at 2–16.] Despite Sunbelt's efforts to frame this as a question of assumption of risk, Sunbelt is really arguing that Plaintiff's negligence in utilizing the Ranger renders comparative negligence a viable defense. Here, Plaintiff's own alleged misuse of the Ranger—for instance, peeling out while turning sharply, defeating the safety mechanism that limits the Ranger's speed, and failing to read the Ranger's warnings or manual—inspires Sunbelt's argument that Plaintiff was comparatively negligent. [*See id.*] These factual issues are only relevant to the question of proximate cause under *Suter*, not whether Plaintiff had a meaningful choice. Therefore, this line of argument will only be permitted with

---

[5] Sunbelt does not offer any alternative interpretation of the *Suter* language that would change the Court's reasoning, either. Nor does Sunbelt cite any caselaw suggesting the relevant language is applicable here. [*See* Docket No. 225.]

18

respect to proximate cause and in accordance with the "second-collision damages" discussion, below.

This ruling comports with relevant precedent. For instance, in *Cavanaugh v. Skil Corporation*, an employee set a circular saw down while the blade was still spinning and it "traveled [backwards] across the" floor, ran over part of the plaintiff's foot, and severed two of his toes. 331 N.J. Super. 134, 143, 145 (App. Div. 1999), *aff'd*, 164 N.J. 1 (2000). The saw was equipped with a blade guard that was supposed to cover the exposed part of the saw when the trigger was disengaged, but it did not work on the day in question. *See id.* at 143. The defendant presented evidence that the blade guard did not work because it "had been purposely wedged open." *See id.* at 189–90. Nevertheless, the Court ruled that

> This evidence goes beyond mere negligence. Indeed, the wedging theory presented by defendant goes to an intentional act on the part of plaintiff that would have created the very situation that gave rise to the accident. Plaintiff testified that he knew about wedging open the lower guard. In other words, had plaintiff wedged open the lower guard, he would have voluntarily proceeded to encounter a known risk—a risk he had purposely created. This type of conduct is not exempted by *Suter* or *Tirrell*. However, defendant's argument does not seem to be based upon a knowing and voluntary assumption of the risk. Instead, it appears to be based upon plaintiff's **negligence** and defendant's desire to have fault apportioned between the parties . . . . While plaintiff's alleged wedging of the guard, if proven, would have constituted misuse of the product on plaintiff's part, the misuse was obviously foreseeable to defendant inasmuch as [defendant's expert] testified that he had seen workers wedge open lower guards. Yet, **misuse goes to the issue of proximate cause**, [not comparative negligence].

*Id.* (first emphasis in original). Applying the *Cavanaugh* logic to the facts at hand illustrates that Sunbelt's arguments that Plaintiff created the very dangers that led to

his injury "go[] to the issue of proximate cause" and therefore may only be considered for that purpose. *See id.*

### 2.   Applicability of *Suter* and *Green* to Plaintiff's Negligence Claims

Plaintiff's Motion for Summary Judgment also argues that, per *Green v. Sterling Extruder Corp.*, 95 N.J. 263 (1984), the *Suter* rule outlined above also applies to Plaintiff's negligence claims, which he pleads in the alternative. [*See* Docket No. 206, at 10.] Specifically, *Green* stated:

> We fail to see any reason of policy or elemental justice why the selfsame principle should not be applicable in the situation before us. The fact that plaintiff's claim is grounded in negligence rather than in strict liability does not bear on any of the considerations that generated the principle in the first place. Contributory negligence would serve to excuse the very conduct that gives rise to strict liability on the part of the manufacturer. Precisely the same is true of the manufacturer's liability in negligence.

*Id.* at 272.

Sunbelt argues that *Green* should not apply to Plaintiff's negligence claims. [Docket No. 225, at 17–18.] In making this argument, Sunbelt states that "[f]or the same reasons that Sunbelt's comparative negligence defense is appropriate under Plaintiff's strict liability claim, it is appropriate as a defense in any remaining negligence claim." [*Id.* at 18.] However, the Court already rejected those arguments, above. The Court now rejects them with respect to Plaintiff's negligence claims for the same reasons as discussed above. Therefore, Plaintiff is correct that his own comparative negligence will not be considered on the negligence claims, other than

20

to determine proximate cause and in accordance with the "second-collision damages" discussion, below.

### 3.   Defendant's *Waterson* Argument

Finally, Plaintiff argues that his nonuse of a seat belt "has no bearing on damages because *Suter* and *Green* preclude any consideration of comparative fault." [Docket No. 206-1, at 10 (cleaned up).] Defendant argues that, per *Waterson v. General Motors Corp.*, 111 N.J. 238 (1988), Plaintiff's failure to wear an available seat belt should be considered and can reduce his potential damages. [*See* Docket No. 225, at 18–19.]

The New Jersey Supreme Court recognized in *Waterson* that, in a case involving the nonuse of a seat belt, the

> plaintiff's injuries ar[i]se from two separate and distinct collisions. **Consequently, the relevant inquiry is not whether the failure to use a seat belt contributed to the cause of the accident but whether the nonuse of a seat belt contributed to plaintiff's injuries.** Central to [this] holding is the belief that juries must understand the distinction between the two events, and that "[w]earing seat belts has relevance only with respect to the 'second collision.'" [The Court] also h[e]ld that in order for a jury to consider seat belt nonuse in reducing damages, the failure to wear a seat belt must increase the extent or severity of injury.

*Waterson*, 111 N.J. at 264 (emphasis added) (quoting *Dunn v. Durso*, 219 N.J. Super. 383, 395 (Law Div. 1986)). The Court defined "[s]econd-collision injuries" (which "are sometimes referred to as add-on or enhanced injuries") as "injuries that the use of a seat belt arguably could prevent." *Id.* at 252.

21

The Court also expressly held "that an injured party's failure to use a seat belt **does not constitute contributory negligence that bars recovery by the injured party against the manufacturer for a defective design or defective manufacture**." *Id.* at 268 (emphasis added). It continued, "Although nonuse of a seat belt cannot bar recovery when seat belt nonuse does not contribute to the accident, it may reduce recovery for second collision injuries or what we have called 'seat-belt damages.'" *Id.* The Court then reiterated "that nonuse of a seat belt does not constitute contributory negligence sufficient to bar a recovery in strict liability." *Id.*

*Waterson* developed the following "equation" to be used to calculate how much a plaintiff's damages should be reduced due to the failure to wear a seat belt:

(1) The jury determines total damages as if there were no seat belt issue at all.

(2) The jury determines the comparative fault of each party in causing the accident and expresses those determinations in terms of a percentage (*e.g.*, General Motors for the defective axle and plaintiff for any applicable negligence on her part, such as if it could be shown that she knew of the defective axle and drove anyway or that she drove inattentively and at an excessive rate of speed).

(3) The jury determines whether plaintiff's nonuse of a seat belt increased the extent or severity of plaintiff's injuries and whether plaintiff's nonuse of a seat belt constituted negligence.

(4) The jury determines plaintiff's second-collision injuries, or seat-belt damages.

(5) The jury determines the percentage of plaintiff's comparative fault for the second-collision injuries or seat-belt damages. The court should inform the jury that plaintiff's fault for failure to wear a seat belt will be added to plaintiff's fault, if any, in causing the accident to reduce further

> plaintiff's award in an amount proportionate also to defendant's relative fault in causing the accident.
>
> (6) The court determines plaintiff's recovery by molding the jury's damages and negligence findings.

*Id.* at 274.

Here, the parties dispute the applicability of *Waterson*. Plaintiff argues that *Suter* and *Green* "preclude any consideration of comparative fault." [Docket No. 206-1, at 10 (cleaned up).] He contends that the *Waterson* doctrine ultimately sounds in "principles of the Comparative Negligence Act" and that "extend[ing] a *Waterson* jury charge to a *Suter* case would nullify the policy reasoning behind *Suter*" that "irrespective of any argument that an employee may have unreasonably and voluntarily encountered a known risk, said employee is not guilty of contributory negligence." [*Id.* at 11–12 (quoting *Suter*, 81 N.J. at 167).]

The Court finds that Plaintiff's argument is belied by the express language of *Waterson* itself: "[A]n injured party's failure to use a seat belt **does not constitute contributory negligence** . . . ." *Waterson*, 111 N.J. at 268 (emphasis added). Rather, it may only "reduce damages for second collision injuries" that were not proximately caused by the alleged defect or negligence of the defendant. *See id.* The Court therefore agrees with Sunbelt's argument that Plaintiff's damages may be reduced to the extent that a jury finds Plaintiff's nonuse of a seat belt exacerbated his damages. This does not run afoul of the *Suter* and *Green* preclusions as Plaintiff argues.

23

Moreover, Plaintiff has argued in his briefs and at the December 14 hearing that *Waterson* only applies to cases involving automobiles being driven on public roads. The Court finds this reading of *Waterson* to be too limited. In *Schwarze v. Mulrooney*, the New Jersey Superior Court Appellate Division squarely addressed "whether comparative negligence principles are applicable to 'second collision' injuries—those injuries not directly caused by the crash alone and which could have been avoided had the plaintiff exercised reasonable care for his or her own safety." 291 N.J. Super. 530, 533–34 (App. Div. 1996). In that case, the plaintiff was driving a pickup truck that collided with the defendant's car after the defendant negligently entered traffic. *See id.* at 535. The defendant "acknowledged that she was partially at fault in causing the accident." *Id.* at 533. As a result of the collision, the "plaintiff's head was thrown forward and then back again without contacting any of the truck's interior surfaces." *Id.* at 535. However, the plaintiff had a generator in the bed of his pickup truck, which he had neglected to tie down. *Id.* at 534–35. The generator "was thrown forward by the momentum of the crash and penetrated the cab window, striking plaintiff in the back of the head," which "was thrown forward a second time." *Id.* at 535. Fortunately, the plaintiff "again avoided contact with any part of the truck's interior." *Id.* Nevertheless, he suffered injuries. *See id.* at 533.

The *Schwarze* Court determined that the

case involve[d] two impacts, each of which potentially caused [the] plaintiff's injuries. The first impact was the collision between [the] . . . vehicles, which caused [the] plaintiff's head to move forward rapidly and snap back. The second impact was the striking of [the] plaintiff's

24

head by the generator, which caused it to snap forward and backward a second time.

*Id.* at 538. The Court then had to decide whether the plaintiff's "failure to secure the generator," which "did not contribute to the **cause** of the collision, but . . . could very well have contributed to his injuries," should be considered for comparative negligence purposes. *Id.* (emphasis added). It ruled that, despite "differ[ing] in its specifics from *Waterson*," *Schwarze*'s "core issue [was] essentially the same": the plaintiff's "antecedent negligent conduct did not contribute to the cause of the accident, but perhaps enhanced the severity of the injuries he sustained." *Id.* at 541. Therefore, while the defendant could not utilize the plaintiff's conduct with respect to the Comparative Negligence Act, it could present "evidence . . . isolating the second collision injuries" that the plaintiff suffered and reduce the plaintiff's damages on that basis. *Id.* at 541–42.

*Schwarze* did not involve a seat belt at all, yet the Superior Court found it appropriate to apply "the fundamental principle underlying *Waterson*." *Id.* at 540. Therefore, the issue is not about whether the plaintiff wore a seat belt while driving an automobile on a public road, as Plaintiff argues. [*See* Docket No. 206-1, at 12–13.] Rather, it is about whether the plaintiff's actions or omissions resulted in a "second collision" that enhanced the plaintiff's damages.[6] *See, e.g., Nunez v. Schneider Nat'l*

---

[6] Plaintiff's references to New Jersey Model Jury Charge 8.1 is also unconvincing. [*See* Docket No. 206-1, at 11–13.] While that charge alludes to motor vehicles, streets, and highways, it ultimately asks the jury "whether [the] plaintiff acted as a reasonably prudent person and, therefore, was or was not negligent in not using a

25

*Carriers, Inc.*, 217 F. Supp. 2d 562, 570 (D.N.J. 2002) (citing *Waterson* and ruling that a defendant could present evidence that the decedent's "failure to wear a safety helmet" while riding a bike "increased the extent or severity of [the] plaintiff's injuries"). *But see Cordy v. Sherwin Williams Co.*, 975 F. Supp. 639, 647–48 (1997) ("[W]e hold that an adult bicyclist's failure to wear a helmet is not a failure to mitigate damages."). Therefore, Sunbelt will be permitted to present evidence that Plaintiff's failure to wear the available seat belt exacerbated his injuries.

Finally, the Court also notes that Sunbelt bears the burden of proving which damages were caused solely by the "second collision." *See Schwarze*, 291 N.J. Super. at 540–41 ("Placing upon [the] defendant the ultimate burden of demonstrating which injuries are attributable to which impact is consistent with New Jersey decisions regarding apportionment in other tort law contexts.") Plaintiff argues that Sunbelt cannot meet this burden here given its proffered expert testimony. [*See* Docket No. 206-1, at 14–20.] Much of this argument appears to contemplate questions of fact and the weight of Sunbelt's experts' opinions, as opposed to their admissibility. [*See id.* (calling Sunbelt's expert's opinions "speculation," challenging the thoroughness of the expert's opinion regarding the nonuse of the seat belt).] The

---

seatbelt." [*Id.*] That is precisely what the jury would be deciding here: whether Plaintiff acted as a reasonably prudent person when he chose not to use his seat belt. The jury charge does not, therefore, **require** that the plaintiff was driving a motor vehicle on a street or highway; rather, it includes those details as examples of things to consider when determining the reasonableness of the plaintiff's actions.

26

Court will consider these arguments when the parties submit (or resubmit, [*see* Docket Nos. 205, 223]) their *Daubert* motions.

In sum, for the above reasons, the Court will grant, in part, and deny, in part, Plaintiff's Motion for Summary Judgment [Docket No. 206].

## C.   Sunbelt's First Motion for Summary Judgment [Docket Nos. 207, 284]

In its first Motion for Summary Judgment, Sunbelt argued in part that each of Plaintiff's claims against it should be dismissed. [*See* Docket No. 207-3.] As noted above, Plaintiff's Fourth Amended Complaint alleges the following claims against Sunbelt: Violation of the New Jersey Products Liability Act for Manufacturing Defect (Count I), Design Defect (Count II), Failure to Warn (Count III), and Breach of Implied Warranty (Count IV); and Negligence (Count V). [Docket No. 97.] Sunbelt argues that each of those claims should be dismissed.[7] The Court will address each in turn.

### 1.   Manufacturing Defect (Count I)

Under the NJPLA, "a manufacturer or seller of a product" is liable for a manufacturing defect if "the product causing the harm was not reasonably fit,

---

[7] The Court notes that while Sunbelt's Proposed Order includes granting summary judgment on Count IV, Sunbelt's Motion itself does not directly make the necessary argument for such a ruling. Regardless, the Court would have found that genuine issues of material facts exist with respect to this claim, specifically regarding the presence of the cab nets and Sunbelt's knowledge of the planned use on pavement. Therefore, the Court did not grant summary judgment on that Count. [*See* Docket No. 299.]

suitable or safe for its intended purpose because it . . . deviated from the design specifications, formulae, or performance standards of the manufacturer." N.J. STAT. ANN. § 2A:58C-2. Sunbelt is subject to the NJPLA as a "product seller" because it ordinarily "sells, . . . leases, . . . , repairs, . . . maintains or otherwise is involved in placing [the Ranger] in the line of commerce." *Id.* § 2A:58C-8.

Here, the allegation is that Sunbelt removed the cab nets, which were included in the "design specifications" of the Ranger's manufacturer, Solaris. There is a genuine issue of material fact as to whether the Ranger in question had cab nets at the time that Sunbelt leased it to Live Nation. Should a jury find that the Ranger did not have cab nets at the time that Sunbelt leased it to Live Nation, it could reasonably conclude that Sunbelt, as a product seller, is liable for leasing a Ranger that deviated from the design specifications of the manufacturer. Therefore, the Court will rule that Plaintiff's manufacturing defect claim against Sunbelt (Count I) survives.

## 2. Design Defect (Count II)

Under New Jersey precedent, "the issue upon which most [design defect] claims will turn is the proof by plaintiff of a 'reasonable alternative design . . . the omission . . . [of which] renders the product not reasonably safe.'" *Cavanaugh v. Skil Corp.*, 164 N.J. 1, 8 (2000) (quoting *Green v. General Motors Corp.*, 310 N.J. Super. 507, 517–18 (App. Div. 1998)). Here, Plaintiff contends that it is safe to operate golf carts and certain other types of UTVs on pavement, so those options constitute a "reasonable alternative design." [*See* Docket No. 224, at 12.] The Court holds that

28

providing an alternative product—but not an alternative **design**—is insufficient to satisfy the above standard. *See, e.g.*, *Brown v. Johnson & Johnson*, 64 F. Supp. 3d 717, 722 (E.D. Pa. 2014) (citing multiple cases to support the conclusion that "acetaminophen is not an alternative to ibuprofen but an entirely different product"); *Salvio v. Amgen Inc.*, Civil No. 11-553, 2012 U.S. Dist. LEXIS 19009, at *7 (collecting cases to support the conclusion that "an alternative design must not be an altogether essentially different product"); *Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 208 (Ala. 2016) (holding that a plaintiff must provide evidence of "the existence of a safer, practical, alternative design for the allegedly defective product" and not merely of "a design for a different, albeit similar, product"). Plaintiff has not offered a "reasonable alternative **design**" so much as it has pointed to alternative **products** that Sunbelt could have rented to Live Nation. Lacking a reasonable alternative design, the Court will grant Sunbelt's Motion for Summary Judgment with respect to Plaintiff's design defect claim against Sunbelt (Count II).

### 3.    Failure to Warn (Count III)

The NJPLA provides that a seller of a product is liable for failure to warn if "the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . failed to contain adequate warnings or instructions." N.J. STAT. ANN. § 2A:58C-2. The New Jersey Superior Court Appellate Division has held that "[w]hat might otherwise be an adequate warning can be undermined and made ineffective by counteracting representations." *Levey v. Yamaha Motor Corp.,*

*U.S.A.*, 361 N.J. Super. 312, 316–19 (App. Div. 2003) (reversing the granting of the defendant's motion for summary judgment where a boat salesperson deliberately attempted to get the boat to go airborne during a sales pitch despite written warnings against operating the boat in such a manner) (quoting 1 JERRY J. PHILLIPS & ROBERT E. PRYOR, PRODUCTS LIABILITY § 6.07, at 6–45 (rev. 2002)). Here, a reasonable jury could find that Sunbelt undermined and made the manufacturer's warnings ineffective by advertising the Ranger as safe to transport cargo and people on "any type of terrain" when, in fact, the Ranger's warnings indicated that it should not be driven on paved surfaces. Therefore, the Court will deny Sunbelt's Motion for Summary Judgment with respect to Plaintiff's failure to warn claim (Count III).

### 4.    Negligence (Count V)

In New Jersey, a claim for negligence requires the plaintiff to establish four elements: "(1) a duty of care; (2) a breach of that duty; (3) proximate cause; and (4) actual damages." *See Townsend v. Pierre*, 221 N.J. 36, 51 (2015) (quoting *Polzo v. Cnty. of Essex*, 196 N.J. 569, 584 (2008)). In this case, Plaintiff brings negligence claims in the alternative to his strict liability claims against Sunbelt.

"The question of whether a duty exists is a matter of law properly decided by the court, not the jury." *Kernan v. One Washington Park Urban Renewal Assocs.*, 154 N.J. 437, 445 (1998) (quoting *Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc.*, 135 N.J. 182, 194 (1994)). Here, Sunbelt and Plaintiff dispute whether Sunbelt owed Plaintiff a duty of care. In New Jersey, foreseeability of harm "is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate."

*Carter Lincoln-Mercury*, 135 N.J. at 194. Plaintiff argues that "Sunbelt had a duty of care to provide Live Nation and Plaintiff with a vehicle suitable for operation on 'any type of terrain.'" [Docket No. 224, at 18.] "Sunbelt knowingly rented an off-road Ranger not suitable for use on paved surfaces to an urban concert venue." [*Id.* at 19.] Therefore, Plaintiff contends, "it was foreseeable that injury would occur to the operator of an overturning Ranger." [*Id.*] The Court agrees with Plaintiff that, as a general principle, a company owes a duty of care to foreseeable users of products that it rents. The Court is not in a position to decide whether Sunbelt breached that duty or whether such breach proximately caused Plaintiff's damages. Those questions will remain for the jury. Therefore, the Court will deny Sunbelt's Motion for Summary Judgment with respect to Plaintiff's negligence claim (Count V).

In sum, the Court will grant, in part, and deny, in part, Sunbelt's first Motion for Summary Judgment [Docket No. 207] with respect to Plaintiff's claims against Sunbelt.

### D. Sunbelt's [Docket Nos. 207, 272, 284] and Live Nation's [Docket No. 283] Motions for Summary Judgment

Part of Sunbelt's first Motion for Summary Judgment [Docket Nos. 207, 284] and all of its second Motion for Summary Judgment [Docket No. 272] argue that the Court should grant judgment in Sunbelt's favor on its breach of contract and indemnity claims against Live Nation, as well as on Live Nation's crossclaims against Sunbelt. Conversely, Live Nation's Motion for Summary Judgment [Docket No. 283] argues that the Court should enter judgment in Live Nation's favor on

Sunbelt's crossclaims against it. With respect to these Motions, the Court will effectively make four rulings: (1) the Service Agreement applies to the rental of the Ranger; (2) there are genuine issues of material fact as to whether Live Nation or Sunbelt breached first, so the parties' crossclaims for breach of contract and indemnity must survive summary judgment; (3) the cross-indemnification provisions are enforceable, although it remains to be seen how if and how they will apply to this case; and (4) the limitation of liability provision is enforceable.

With respect to the first finding, the Court notes that there can be no legitimate dispute that the Services Agreement applies to the rental of the Ranger. The Court agrees with Sunbelt's analysis that the parties understood the Services Agreement to apply; that Live Nation's crossclaims only make sense if the Services Agreement applies; that the Services Agreement [Docket No. 207-37] is valid and enforceable, as well as unambiguous and clear; and that, by its own clear terms, the Services Agreement applied to the rental in question. [*See* Docket No. 285.] Therefore, the Court will rule that the Services Agreement applies to the Ranger rental.

However, with respect to the second finding, several genuine issues of material fact exist, including: who, if either party, removed the cab nets; whether Sunbelt provided the Owner's Manual and instructional DVD to Live Nation; whether Sunbelt's advertisements contradicted the Ranger's warnings regarding operating the Ranger on pavement; and whether Sunbelt knew where Live Nation intended to utilize the Ranger. In other words, there are several factual questions that need to be

32

resolved before a finding can be made as to which party breached first. As such, the

Court will deny the parties' Motions for Summary Judgment [Docket Nos. 207, 272,

283, 284] insofar as they sought judgment on their crossclaims.

Third, the Court finds that the cross-indemnity provisions are enforceable. The

provisions read, in their entirety:

> A. To the fullest extent permitted by law, [Sunbelt] expressly agrees to
> indemnify, defend and hold harmless the [Live Nation] Parties from
> and against any and all claims, citations, penalties or other loss
> arising out of any violation of any law, rule, regulation or order, and
> from any and all claims or liabilities, including reasonable attorneys'
> fees, for loss, damage or injury to persons or property of whatever
> kind or nature arising from the acts or omissions of [Sunbelt], its
> parents, partners, affiliates, subsidiaries, successors or assigns and
> each of their respective agents, employees, representatives and
> contractors.

> B. To the fullest extent permitted by law, [Live Nation] expressly
> agrees to indemnify, defend and hold harmless [Sunbelt] from and
> against any and all claims or loss arising out of any violation of any
> law, rule, regulation or order, and from any and all claims or
> liabilities, including reasonable attorney's fees, for loss, damage or
> injury to persons or property of whatever kind or nature arising from
> the negligence or willful misconduct of [Live Nation] in
> performance of this Agreement.

[Docket No. 207-37, at 2, ¶ 6.] Under California law—which applies to the Services

Agreement, [*see* Docket No. 207-37, at 3, ¶ 10(F); *id.* at 4]—a contractual "indemnity

agreement may provide for indemnification against an indemnitee's own negligence,

but such an agreement must be clear and explicit and is strictly construed against the

indemnitee." *Rossmoor Sanitation, Inc. v. Pylon, Ind.*, 13 Cal. 3d 622, 628 (1975). The

California Supreme Court continued, "If an indemnity clause does not address itself

to the issue of an indemnitee's negligence, . . . [it] may be construed to provide

indemnity for a loss resulting in part from an indemnitee's **passive** negligence, [but it] will not be interpreted to provide indemnity if an indemnitee has been **actively** negligent." *Id.* (emphases in original). As is clear from the above excerpt, the Services Agreement does not explicitly refer to Live Nation's agreement to indemnify Sunbelt for Sunbelt's own negligence. [Docket No. 207-37, at 2, ¶ 6(B).] Therefore, under California Supreme Court precedent, Live Nation is obligated to indemnify Sunbelt for Sunbelt's **passive** negligence, but not for its **active** negligence. *See Rossmoor*, 13 Cal. 3d at 628. Whether Sunbelt was negligent at all and whether such negligence was passive or active remain questions of fact. Therefore, the Court will not determine how the indemnification provisions apply in this case, other than to simply hold that they are generally enforceable.[8]

Finally, the Services Agreement includes the following paragraph:

13. LIMITATION OF [SUNBELT] LIABILITY. IN
    CONSIDERATION OF THE RENTAL OF THE RENTAL

---

[8] Live Nation appears to slightly misconstrue the holding in *Rossmoor* as stating that an indemnification provision's failure to distinguish between active and passive negligence renders the provision invalid. [*See* Docket No. 286, at 25–26.] But this contradicts *Rossmoor*, which held that such a provision will be considered a "general" clause, whose applicability is restricted to passive negligence. *Rossmoor*, 13 Cal. 3d at 628–29. The Court therefore disagrees with Live Nation's argument that the failure to address "the distinction of active versus passive negligence of Sunbelt" renders "the indemnification provisions, as written, . . . unenforceable under California law." [Docket No. 286, at 26.]

The Court notes, however, the accuracy of Live Nation's point that the cross-indemnification provisions could be effectively "nullif[ied]" if the jury finds that damages were caused by both Sunbelt and Live Nation's actions or negligence. [*See id.* at 25–26.] Again, this factual question need not be determined by the Court at this stage and will be left for the jury. It has no affect on the general enforceability of the indemnification provisions.

> EQUIPMENT, [LIVE NATION] AGREES THAT
> [SUNBELT'S] LIABILITY UNDER THIS CONTRACT,
> INCLUDING ANY LIABILITY ARISING FROM
> [SUNBELT'S] OR ANY THIRD PARTY'S COMPARATIVE,
> CONCURRENT, CONTRIBUTORY, PASSIVE OR ACTIVE
> NEGLIGENCE OR THAT ARISES AS A RESULT OF ANY
> STRICT OR ABSOLUTE LIABILITY, SHALL NOT EXCEED
> TWO TIMES THE TOTAL RENTAL CHARGES PAID BY
> [LIVE NATION] UNDER THE APPLICABLE PURCHASE
> ORDER.

[Docket No. 207-37, at 8, ¶ 13.] It is undisputed that the relevant rental charges paid by Live Nation here were $575.00 for the Ranger. [*See* Docket No. 272-1, at 23.] Therefore, Sunbelt argues that "to the extent that any damages are awarded against Sunbelt, . . . the maximum amount of damages payable by Sunbelt is $1,150.00." [*Id.*] Live Nation conceded at the December 14 hearing that this provision is enforceable. Therefore, the Court holds that it is enforceable.[9]

---

[9] Moreover, the Court notes that it would deem the provision enforceable under California law if Live Nation challenged its conscionability. "Limitation of liability provisions have long been recognized as valid in California." *Markborough Cal. v. Superior Court*, 277 Cal. Rptr. 919, 925 (Cal. Ct. App. 1991); *see also Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 147 Cal. Rptr. 3d 634, 641–42 (Cal. Ct. App. 2012) (quoting *Markborough*, 147 Cal. Rptr. 3d at 641–42). However, such clauses are unenforceable when unconscionable—that is, "contrary to public policy" in the context of a breach of contract claim or "affect[ing] the public interest" as specified by California precedent in the context of a negligence claim. *Food Safety*, 147 Cal. Rptr. 3d at 642. The California Supreme Court identified six factors to consider when determining whether a provision violates public policy: (1) whether the provision "concerns a business of a type generally thought suitable for public regulation"; (2) whether "[t]he party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public"; (3) whether "[t]he party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards;" (4) whether "[a]s a result of the essential nature of the service, in the economic setting of the

Therefore, the Court will grant, in part, and deny, in part, Sunbelt's Motions for Summary Judgment [Docket Nos. 207, 272, 284] as they related to the claims between Sunbelt and Live Nation. It will deny Live Nation's Motion for Summary Judgment [Docket No. 283].

### E.    Sunbelt's Motion to Redact and Seal [Docket No. 237]

Per 28 U.S.C. § 657(b), "the contents of any arbitration award made under this chapter shall not be made known to any judge who might be assigned to the case until the district court had entered final judgment in the action or the action has otherwise terminated." The statute also provides that, "[u]pon a demand for trial de novo, the action shall be restored to the docket of the court and treated for all purposes **as if it had not been referred to arbitration**." *Id.* § 657(c)(2). The District of New Jersey's Local Rules similarly provide: "Neither the Clerk nor any party or attorney shall disclose to any Judge to whom the action is or may be assigned the contents of the arbitration award . . . ." L. Civ. R. 201.1(g).

Here, Live Nation seeks to allude to testimony that was made during the arbitration hearing, at which there was no court reporter and therefore no transcript.

---

transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services"; (5) whether "[i]n exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence"; and (6) whether, "[a]s a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." *Tunkl v. Regents of Univ. of Cal.*, 60 Cal. 2d 92, 98–101 (1963). Applying those factors to this case, the Court concludes that the limitation of liability provision is enforceable.

Thus, Live Nation simply cited the arbitrator's decision, which referred to the testimony in question. This is impermissible for two reasons: First, the Court cannot be fully certain that the arbitrator's recollection of the testimony is entirely accurate, which renders it arguably unreliable. Second, and more importantly, the Court finds that Live Nation's reference to the arbitrator's decision violates the above statutes and local rules, and is therefore impermissible. As such, the Court will grant Sunbelt's Motion to Redact and Seal [Docket No. 237] in its entirety.[10]

## VI.    CONCLUSION

Therefore, for the reasons set forth herein, the Court will grant, in part, and deny, in part, the parties' motions. An accompanying Order shall issue.

December 17, 2021                              s/Renée Marie Bumb
Date                                          Renée Marie Bumb
                                              United States District Judge

---

[10] The Court notes that, regardless of this ruling, none of its analysis in this Opinion would have been affected by the consideration of the information Live Nation sought to cite.